UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
SEP 25 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

STEVEN BARROWS,

Plaintiff,

v. 25-CV-665 (JLS)

NEW YORK STATE CORRECTIONAL OFFICERS AND POLICE BENEVOLENT ASSOCIATION, INC., JOHN DOES 1-250, DANIEL MARTUSCELLO, and KATHY HOCHUL,

Defendants.

**DECISION AND ORDER**

As alleged, on February 17, 2025, the New York State Department of Corrections and Community Supervision ("DOCCS") was beset by a strike at several of its facilities, including the one at issue in this action, Elmira Correctional Facility ("Elmira"). Dkt. 1 ¶¶ 16-19. The inmates at Elmira were locked in their cells for several days without being provided food, medication, or other "essentials." *Id.* ¶ 20. They had no access to the telephone, email, postage, or any way to communicate with others outside the facility. *Id.*

*Pro se* Plaintiff Steven Barrows, was a prisoner confined at Elmira during the strike and has filed this action seeking relief under 42 U.S.C. §§ 1983, 1985 and 1986, and state common law. He alleges that Defendants, New York State

Correctional Officers and Police Benevolent Association, Inc. ("NYSCOPBA"), New York State Governor Kathy Hochul ("Hochul"), DOCCS Commissioner Daniel Martuscello ("Martuscello"), and John Does 1-250, representing striking corrections staff, Dkt. 1 ¶¶ 5B-G, were deliberately indifferent to the conditions he and other inmates were subjected to during the strike and conspired to deny him his constitutional rights. *See, e.g.*, Dkt. 1 ¶ 1. He currently is confined at the Woodborne Correctional Facility.

Barrows seeks permission to proceed *in forma pauperis* ("IFP") and has filed the required authorization. Dkt. 2. Because Barrows meets the requirements of 28 U.S.C. § 1915(a) and filed the required authorization, he is granted permission to proceed IFP. The Court therefore screens his complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a).

For the reasons below, Barrows's Eighth Amendment conditions of confinement claim may proceed to service and all other claims are dismissed with leave to amend.

## DISCUSSION

### I. LEGAL STANDARDS

#### A. Review Under the IFP Statutes

A court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the court determines the action "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a

defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1)-(2); *see* 28 U.S.C. § 1915(e)(2)(B) (setting forth the same criteria for dismissal).

**B. Pleading Standards**

In evaluating a complaint, the court must "accept all of the facts alleged in the complaint as true and draw all inferences in the plaintiff's favor." *Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003). Although "a court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even a *pro se* complaint must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint states a claim for relief if the claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, although a *pro se* complaint need not provide every last detail in support of a claim, it must contain sufficient factual allegations to nudge the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. *See Komatsu v. Cubesmart, Daniels Norelli Cecere & Tavel PC*, No. 20-3676-CV, 2021 WL 6060603, at *1 (2d Cir. Dec. 20, 2021) (summary order) (to avoid *sua sponte* dismissal under the IFP statute, "a complaint must plead 'enough facts to state a claim to relief that

is plausible on its face'" (quoting *Twombly*, 550 U.S. at 570)); *Scott Phillip Lewis v. R.L. Vallee, Inc., d.b.a. Maplefield's*, No. 24-1438, 2025 WL 1077412, at *1 (2d Cir. Apr. 10, 2025) (summary order) (same).

The Court's liberal pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint fails to state a claim if it supplies only "labels and conclusions," *Twombly*, 550 U.S. at 555, "a formulaic recitation of the elements of a cause of action," *id.*, or "'naked assertions' devoid of 'further factual enhancement,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Although a court is "obligated to draw the most favorable inferences that [a plaintiff]'s complaint supports, [it] cannot invent factual allegations that he [or she] has not pled." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

**C. Section 1983 Claims**

To state a claim under 42 U.S.C. § 1983, a plaintiff "must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

To establish liability against an official under Section 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a link in the chain of command. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004). Moreover, the theory of *respondeat superior* is not available in a § 1983 action. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). There is "no special rule for supervisory liability." *Tangreti v. Bachmann,* 983 F.3d 609, 618 (2d Cir. 2020). Rather, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Iqbal*, 556 U.S. at 676).

**D. Leave to Amend**

Generally, a court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal, unless it "can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (quoting *Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999)). But a court may deny leave to amend pleadings when any amendment would be futile. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend.").

## II. ALLEGATIONS[1]

A liberal reading of the complaint tells the following story. Barrows alleges that NYSCOPBA and its members, including security personnel and corrections officers at ECF (John Does 1-250) and other DOCCS facilities, over the course of several years leading up to the strike "vehemently opposed and sought to undo . . . numerous changes to New York State statutes, regulations, and policies, which aim[ed] to improve safety and conditions for incarcerated people, and . . . to enhance accountability for NYSCOPBA and its members." Dkt. 1 ¶ 8. NYSCOPBA and its members, including John Does 1-250, engaged in several "corrupt activities" and spent great effort to "undermine and nullify" reforms within DOCCS, including reforms to solitary confinement and the use of body cameras. *Id.* ¶¶ 9-10. "The sole purpose of these efforts was to create and maintain a culture and environment of absolute impunity for NYSCOPBA members . . . to enable them to terrorize and harm incarcerated [individuals] through . . . [the] use of excessive force" and other constitutional violations. *Id.* ¶ 11.

Barrows alleges that this "pattern and practice of violence" by corrections staff led to the beating death of an incarcerated individual at the Marcy Correctional Facility ("Marcy") in December 2024. *Id.* ¶ 12. Due to the video

---

[1] In light of the procedural posture of this case, initial review pursuant to 28 U.S.C. § § 1915(e)(2)(B) and 1915A(b), the recitation of facts is drawn exclusively from the complaint, the contents of which must be accepted as true for purposes of this review. *See Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (citing *Twombly*, 550 U.S. at 555-56).

footage of this beating and the public outrage that ensued, Hochul and Martuscello "reacted with sweeping orders," including requiring DOCCS security personnel to wear body cameras and record all interactions with incarcerated individuals. *Id.* ¶ 13. This "enraged" corrections officers, including some among the John Does 1-250, "because mass deployment of body cameras" would destroy the "culture of impunity" corrections officers had "fought . . . to preserve." *Id.* ¶ 14. The order deploying body cameras was followed by the indictment of several corrections officers for murder and other charges in the beating death at Marcy. *Id.* ¶ 15.

> Due to "public demand" for accountability, NYSCOPBA and its members conspired at some point to resort to openly-illegal means to get what they want[ed]: They schemed to feign fear of dangerous incarcerated people as a pretext for an illegal work strike, knowing it would throw DOCCS into a state of chaos, and to demand as a condition of ending the strike that numerous changes be made to rescind reforms, with the corrupt and unconstitutional goal of restoring the culture of impunity of NYSCOPBA and its members wanted.

*Id.* ¶ 16. The strike was unlawful under New York law and NYSCOPBA's collective bargaining agreement with the State and, thus, was outside the scope of the corrections officers' employment for purposes of immunity under N.Y. Corr. Law § 24. *Id.* ¶ 17. NYSCOPBA and John Does 1-250 "knew, and maliciously intended, to expose Barrows and other incarcerated people at [Elmira] to significant and unpredictable dangers to their health and safety and otherwise to threaten their basic human needs, with conscious and total indifference to those risks." *Id.* ¶ 18.

On February 17, 2025, John Does 1-250 "illegally abandoned their posts at [Elmira] after locking [Barrows] and everyone else into their assigned cells, with no regard whatsoever for whether or if so how or when [Barrows] and others would get

food, medication, or other basic human needs." *Id.* ¶ 19. No DOCCS or other state employees came to Barrows's housing unit for the first three days of the strike. No food, medicine, or other "essentials" were brought to the incarcerated individuals, and they all were left locked in their cells. *Id.* ¶ 20. There was no phone, email, regular mail, or any method to contact anyone regarding what was occurring at Elmira. *Id.* The inmates all were constantly in fear that they had been abandoned and "would starve to death in their cells." *Id.* ¶ 21. On February 20, 2025—three days after the strike began—a lieutenant walked around reporting that only three to four corrections officers at Elmira were not striking. *Id.* ¶ 22. On that day and the following nine days, the incarcerated individuals received one meal bag, containing two peanut butter and jelly sandwiches, a pair of cookies, one spoonful of coleslaw, and "waterered-down" juice. *Id.* ¶ 23. During this time, while incarcerated individuals were being denied food and medication, NYSCOPBA and its members were making demands for changes to DOCCS's policies, including higher pay and fewer hours. *Id.* ¶ 24.

Barrows alleges that NYSCOPBA took numerous overt acts in furtherance of the conspiracy, including, among other things, providing "logistical and public relations support" to its striking members, despite calling the strike illegal, "making exaggerated statements [about the] dangerous conditions in DOCCS facilities," lobbying legislatures to meet the demands of the strikers, and negotiating with Hochul and Martuscello. *Id.* ¶ 25.

Hochul and Martuscello "acted with only slightly less indifference." *Id.* ¶ 26. They did not "deploy[] the full force of the state government" to arrest the leaders of the unlawful strike but rather "negotiated" with them and NYSCOPBA. *Id.* During this time, Barrows and the others were left alone at Elmira "to fend for themselves as the blocks devolved into anarchy, including fires, flooded toilets, and more." *Id.* ¶ 27. The incarcerated individuals had no access to the telephone, mail, showers, laundry, soap, or toilet paper. They had to use washcloths, socks, paper or their hands to clean themselves after using the toilet. The smell was "grotesque and nauseating." *Id.* ¶ 28.

Hochul and Martuscello "knew from many desperate pleas by the few staff remaining at [Elmira] about these horrific and dangerous conditions" there. *Id.* ¶ 29. Hochul and Martuscello had several options to remedy the situation, including deploying the New York State Police or other State workers to provide food and other necessities. "But they instead indifferently allowed [Barrows] and others at [Elmira] to wallow in filth, smoke, and other inhuman conditions." *Id.*

During this entire time, Barrows was locked in his cell 24 hours each day. He did not know when he would see the outside of his cell or even if he would survive. *Id.* ¶ 30. Barrows did not receive "even minimally adequate food on a regular basis" until Hochul finally deployed thousands of National Guard troops to act as prison staff. *Id.* ¶ 31. The strike ended in March 2025, when Hochul and Martuscello faced with public pressure about "coddling of the illegal strikers" reached a deal and fired more than 2,000 NYSCOPBA members. *Id.* ¶ 32. After the

strike ended, Barrows continued to suffer "extreme confinement up to 24 hours per day," with no access to recreation or exercise, visits, legal calls or mail. *Id.* ¶ 34.

Barrows raises claims under 42 U.S.C. §§ 1983, 1985 and 1986, and state law claims alleging "unlawful confinement" and negligence. *Id.* ¶¶ 36-40. He seeks compensatory and punitive damages of "no less" than 10 million dollars.[2] *Id.* at 12.[3]

## III. ANALYSIS

### A. Conditions of Confinement

Liberally construed, Barrows's complaint alleges a violation of the Eighth Amendment's Cruel and Unusual Punishment Clause and a conspiracy to violate his rights under the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1974). The Eighth Amendment requires prison officials to "provide humane conditions of confinement" by "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care, and . . . [by] tak[ing] reasonable measures to guarantee the safety of the inmates." *Id.* (internal quotation marks and citation omitted). At this stage of the litigation and mindful of the Second Circuit's directives to construe *pro se* pleadings liberally, the Court finds that Barrows sets

---

[2] Barrows sues the individual defendants for damages in their individual capacities and in their official capacities if the Court enters injunctive or declaratory relief. Dkt. 1 ¶ 5F.

[3] Page references are to those generated by the Court's Case Management and Electronic Case Files (CM/ECF) system.

forth a plausible Eighth Amendment conditions of confinement claim.[4] [5] However, several issues remain regarding who among the named defendants, if any of them,

---

[4] To the extent Barrows alleges that he, specifically, was denied medical care, this claim is dismissed but with leave to amend. Barrows does not allege that he suffered from any medical condition or need, let alone a serious one, or that a defendant was deliberately indifferent to a serious condition or need. *See Collymore v. Myers,* 74 F.4th 22, 30 (2d Cir. 2023) ("In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'") (alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

[5] The Court could locate only one reported case addressing claims, among several others unrelated to the strike, similar to the ones herein relating to the strike. *McFadden v. Annucci*, No. 9:25-CV-1252 (AJB/ML), 2025 WL 3265447, at *35 (N.D.N.Y. Nov. 24, 2025). In that case, the court determined that, with respect to the plaintiff's conditions of confinement claim based on Martuscello's suspension of out-of-cell privileges during the strike, there was "no basis to plausibly infer from the allegations in the complaint that this occurred based on defendant Martuscello's deliberate indifference to plaintiff's well-being, as opposed to for legitimate penological reasons, such as prisoner and employee safety." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (holding that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests").

Because Barrows alleges far more than just the denial of out-of-cell activities during the strike, this Court cannot make the same conclusion at this stage of the litigation. It may be determined later that Martuscello and others were not deliberately indifferent to Barrows's conditions of confinement and that his actions or inactions were performed consistent with legitimate penological interests. But given the dearth of case law on such claims, the Court cannot make that conclusion on the screening of Barrows's complaint. *See Santana v. Quiros*, No. 3:21-CV-376 (SVN), 2022 WL 16706959, at *9 (D. Conn. Nov. 4, 2022) (the "Second Circuit has explained, dismissal is 'especially disfavored' when 'the complaint sets forth a novel legal theory that can best be assessed after' further factual and legal development" (quoting *Baker v. Cuomo*, 58 F.3d 814, 818-19 (2d Cir. 1995), *vacated in part on other grounds sub nom. Baker v. Pataki*, 85 F.3d 919 (2d Cir. 1996) (en banc))).

may be liable for the unconstitutional conditions of confinement. For example, whether Barrows plausibly alleged that any defendant was personally involved in the alleged violations at Elmira, whether NYSCOPBA is a state actor under Section 1983, and whether the complaint sets forth plausible conspiracy claims under Sections 1983, 1985, and 1986. These issues are addressed below.

### B. First Amendment: Freedom of Association

Barrows alleges he and all other incarcerated individuals at Elmira were denied all contact with anyone during the strike. Dkt. 1 ¶ 20. Although incarcerated individuals retain the right to associate with others, *see Roberts v. United States Jaycees*, 468 U.S. 617–18 (1984), they do "not retain rights inconsistent with proper incarceration," *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).

Courts analyze prisoners' First Amendment freedom of association claims under the framework derived from *Turner*, which instructs courts to ask whether the regulation restricting the right to associate is "reasonably related to legitimate penological interests." 482 U.S. at 89.

> Courts must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 84 (2d Cir. 2021) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006)).

Taking Barrows's allegations as true, he nevertheless fails to explain how the suspension of contact harmed or prejudiced him; whether he had alternative means of communication; why, in light of a walk out by all but a few corrections officers at Elmira, Defendants' decision to suspend visitation was not reasonably related to legitimate penological interests; or who, among the Defendants, suspended his ability to have contact with others. *See, e.g., Hall v. Ekpe*, 408 F. App'x 385, 387-88 (2d Cir. 2010) (summary order) (recognizing security and financial implications as "valid penological interests"); *Jova v. Smith*, 346 F. App'x 741, 744 (2d Cir. 2009) (summary order) (recognizing "legitimate penological interests in maintaining institutional safety, security, and order"). This claim is, therefore, dismissed for failure to state a claim under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1), but with leave to amend.

### C. First Amendment: Incoming and Outgoing Mail

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Bacon v. Phelps*, 961 F.3d 533, 543 (2d Cir. 2020) (quoting *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).

> Restrictions on prisoners' mail are justified only if they 'further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular governmental interest involved. With regard to *legal* mail . . . the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail.

*Ahlers v. Rabinowitz*, 684 F.3d 53, 64 (2d Cir. 2012) (citation modified).

Barrows's bare-bone allegation that there was no access to any mail for an unspecified period of time fails to plausibly allege a First Amendment interference with mail claim. Dkt. 1 ¶ 19. Barrows, however, will be able to amend this claim if he chooses.

## D. NYSCOPBA

### 1. State Actor

In order to state a claim under Section 1983, a plaintiff must allege that the defendant is either a state actor or a private party acting under color of state law. *See Spear v. Town of Hartford*, 954 F.2d 63, 68 (2d Cir. 1992). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'" *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295–96 (2d Cir. 1991). "To qualify as state action, the conduct in question 'must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and 'the party charged with the conduct must be a person who may fairly be said to be a state actor.'" *Id.* (alteration omitted) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

"Labor unions [—like NYSCOPBA—] generally are not state actor[s]." *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002). "The fact that

NYSCOPBA represents public employees does not make it a state actor." *Bell v. New York State Dep't of Corr. & Cmty. Supervision*, No. 1:17-CV-937, 2019 WL 1305809, at *6 (N.D.N.Y. Mar. 22, 2019) (citing *Marrero v. City of N.Y.*, No. 02 CIV. 6634, 2003 WL 1621921, at *4 (S.D.N.Y. Mar. 28, 2003)).

Barrows does not allege specifically that NYSCOPBA is a state actor. *See* Dkt. 1 ¶¶ 5B, 7. He alleges that NYSCOPBA "purports to speak for, defend the interests of, and serve as the collective bargaining representative for uniformed security staff at all DOCCS correctional facilities." *Id.* ¶ 7. Barrows does allege, however, that NYSCOPBA acted under color of state law by conspiring with its members, including John Does 1-250, to strike and deprive the incarcerated individuals at Elmira of their basic needs. *See, e.g., id.* ¶¶ 16, 18, 25, 37-38.

A private actor can be sued under Section 1983 if it "'acted in concert with the state actor to commit an unconstitutional act.'" *Ciambriello*, 292 F.3d at 324 (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). "Put differently, a private actor acts under color of state law when the private action 'is a willful participant in joint activity with the State or its agents.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970)). However, "merely conclusory allegation[s] that a private entity acted in concert with a state actor does not suffice to state a [Section] 1983 claim against the private entity." *Id.* at 324 (finding that plaintiff's conclusory allegations of a conspiracy between the County and the union representing its employees were insufficient to allege that the union

was a state actor (citing *Hughes v. Patrolmen's Benevolent Ass'n of the City of N.Y., Inc.*, 850 F.2d 876, 880–81 (2d Cir. 1988)).

Here, however, Barrows goes to great lengths to allege plausibly that NYSCOPBA conspired with its members to strike and abandon him and the other incarcerated individuals at Elmira. His allegations are not merely conclusory. As set forth above, NYSCOPBA and its members tried to undermine and reverse reforms that DOCCS had taken to protect incarcerated individuals from prolonged solitary confinement and isolation and protect them against the use of excessive or unnecessary force by ordering security personnel to wear body cameras. Dkt. 1 ¶¶ 8-11. After the assault and death of an incarcerated individual at Marcy, which created a great deal of negative publicity for the State, DOCCS, and DOCCS employees and "public demand for accountability," NYSCOPBA and its members conspired to "feign fear" of the dangerousness of incarcerated individuals "as a pretext" for a strike. *Id.* ¶ 16. The purpose of the strike was to turn back DOCCS's reforms. *Id.* Barrows alleges that the union and its members, including John Does 1-250, knew that a strike would "expose" him and others to significant dangers and hardships at Elmira. *Id.* ¶ 18. The strike began on February 17, 2025, when John Does 1-250, locked Barrows and all the incarcerated individuals in their cells and abandoned their posts. *Id.* ¶ 19.

Alleging that a private party was a "willful participant[] engaged in joint activity with the state or its agents" is one theory under which Barrows can allege that NYSCOPBA was a state actor. *Young v. Suffolk County*, 705 F. Supp. 2d 183,

196 (E.D.N.Y. 2010). "Alternatively, to demonstrate that a private party . . . was a state actor engaged in a conspiracy with other state actors under [Section] 1983, a plaintiff must allege (1) an agreement between the private party and state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal." *Id.* at 197 (citing *Carmody v. City of N.Y.,* No. 05-CV-8084 (HB), 2006 WL 1283125, at *5 (S.D.N.Y. May 11, 2006)). "A plaintiff is not required to list the place and date of defendants meetings and the summary of their conversations when he pleads conspiracy, but the pleadings must present facts tending to show agreement and concerted action." *Fisk v. Letterman,* 401 F. Supp. 2d 362, 376 (S.D.N.Y.2005) (citation modified).

The Court recognizes that the allegations of a conspiracy between NYSCOPBA and its members to strike may not be tantamount to an allegation that there was a conspiracy to deprive Barrows of his right to be provided the "minimal civilized measure of life's necessities," *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation modified), but, at this stage in the litigation, the Court cannot find that Barrows has failed to plausibly allege a conspiracy between NYSCOPBA and John Does 1-250, to deprive Barrows of his constitutional rights. It simply cannot be determined, at this time, that NYSCOPBA and John Does 1-250 were not aware of the dangers or harm they were exposing Barrows and the other incarcerated individuals to by locking them in their cells and walking off the job.

Accordingly, the Court finds—for purposes of screening only—that NYSCOPBA acted under color of state law to deprive Barrows of his Eighth Amendment rights to humane conditions.[6] *See supra* at 10-11.

### 2. Section 1983 Conspiracy Claim

As noted in *Ciambriello*, 292 F.3d at 324, the analysis of a Section 1983 conspiracy claim is very similar to the analysis performed above—*i.e.*, whether a private party conspired with a state actor sufficient to support a claim that NYSCOPBA was a state actor. *See supra* at 13-18. To support a Section 1983 conspiracy claim, a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello*, 292 F.3d at 324-25 (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999)). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.* (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)).

---

[6] This conclusion does not preclude the filing of a motion to dismiss or for summary judgment. *See Jordan v. Greater Buffalo United Accountable Healthcare Network*, No. 20-CV-67, 2021 WL 2419564, at *2 (W.D.N.Y. Apr. 20, 2021) ("[A] court's decision allowing some claims to go forward at the initial screening does not insulate those claims from later review on a motion to dismiss." (collecting cases)); *see also Davis v. Lipish*, No. 17-CV-898, 2018 WL 5268122, at *3 (D. Conn. Oct. 23, 2018) (explaining that "[t]he [c]ourt's [i]nitial [r]eview [o]rder is a preliminary screening of the plaintiff's claims, and nothing in this ruling is intended to prevent defendants from moving to dismiss the amended complaint").

As addressed above, the Court finds that Barrows has, at this stage of the litigation, sufficiently alleged a conspiracy between NYSCOPBA and John Does 1-250.[7] Thus, the Eighth Amendment claims alleged in the complaint may proceed to service against NYSCOPBA and, as addressed further below, *see infra* at 22-25, the corrections officer or other security personnel who were assigned to Barrow's block or housing unit on or around February 17, 2025.

**3. Sections 1985 and 1986 Conspiracy Claims**

Barrows also raises claims under Sections 1985(3) and 1986 based on the same allegations summarized above. Dkt. 1 ¶¶ 37-38. "[T]o make out a violation of § 1985(3) . . . , the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of

---

[7] The Court is cognizant of the "intracorporate conspiracy doctrine," which provides that "officers, agents, and employees or agents of a single corporate entity are legally incapable of conspiring together[,]" *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999), and its application to conspiracy claims against state agents or employees, *see, e.g., Vega v. Artuz*, 610 F. Supp. 2d 185, 205 n.20 (N.D.N.Y. Mar. 26, 2009) (collecting cases applying intracorporate conspiracy doctrine to conspiracy claims against state officers or employees). However, the "scope of employment" exception to the intracorporate conspiracy doctrine provides that "when individuals pursue personal interests wholly separate and apart from the entity" the doctrine will not apply. *Vega*, 610 F. Supp. at 205 (citation modified); *see, e.g., Richard v. Fischer*, 38 F. Supp. 3d 340, 353 (W.D.N.Y. Aug. 7, 2014) (same).

Barrows alleges that the striking officers—John Does 1-250—were not acting within the scope of their employment when they engaged in an unlawful strike and abandoned their posts at Elmira. Dkt. 1 ¶ 17. At this stage of the litigation and mindful of the Second Circuit's directives to construe *pro se* complaints liberally, the Court will not rule either whether the intracorporate conspiracy doctrine or the scope of employment doctrine exception applies to Barrows's Sections 1983, 1985 and 1986 conspiracy claims.

persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983). A plaintiff also must allege "some racial or . . . otherwise class-based animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004).

Barrows alleges no facts that could raise a reasonable inference that the strike and the subsequent constitutional violations allegedly caused by the strike, were based on some class-based animus. He thus fails to state a plausible Section 1985(3) conspiracy claim. He is granted leave to amend this claim.

Section 1986 imposes liability on an individual who has knowledge of discrimination prohibited under § 1985. Hence, a Section 1986 claim is contingent on a valid Section 1985 claim. *Mian v. Donaldson, Lufkin & Jenrette Securities*, 7 F.3d 1085, 1088 (2d Cir. 1993). Since Barrows does not allege a valid Section 1985 claim, he does not allege a valid Section 1986 claim either. *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996). This claim too is dismissed, but with leave to amend.

## E. Personal Involvement

### 1. Governor Hochul and Commissioner Martuscello

To allege a claim under Section 1983, the allegations must show how the individual defendant, through his or her own actions, violated the Constitution or federal law. *Tangreti*, 983 F.3d at 618. Barrows alleges that Hochul and

Martuscello received pleas from the few correctional staff left at Elmira regarding the "horrific and dangerous conditions" there. Dkt. 1 ¶ 29. He also alleges that they had several "options" to remedy the conditions, including "deploying state police or other state workers inside the facilities to deliver food and other essentials. But they instead indifferently allowed [Barrows] . . . to wallow in filth, smoke, and other inhuman[e] conditions." *Id.* Hochul eventually deployed the National Guard to staff the prisons, and it was not until that time did Barrows have access to "minimally adequate food on a regular basis." *Id.* ¶ 31.

Inasmuch as Barrows alleges that Hochul and Martuscello were made aware of the conditions at Elmira by the few staff members left at Elmira—an allegation the Court must assume as true—the Court finds, at this preliminary stage of the litigation, that the Eighth Amendment conditions of confinement claim only may proceed to service against Hochul and Martuscello. *See supra* at n.6.

**2. John Does 1-250**

Barrows sues John Does 1-250, whom he claims are the corrections officers or other security staff at Elmira "who abandoned their posts at [Elmira] and otherwise participated in the conspiracy that caused the" alleged unconstitutional conditions of confinement. Dkt. 1 ¶ 5C. He asks that the Court enter a *Valentin* Order, *see Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), directing the New York State Attorney General's Office ("AG's Office") and Hochul and Martuscello to provide the full names, titles, and employee identification numbers of DOCCS corrections staff "known to . . . Hochul and/or Martuscello" who abandoned their posts at Elmira. *Id.*

¶ 6. Barrows alleges that prior to striking—*i.e.*, abandoning their posts—correctional officers locked them in their cells knowing what would occur when they walked out. *Id.* ¶ 19.

As pleaded by Barrows, he claims that he and others were locked in their cells by corrections officers or other security staff who then walked off the job knowing the inhumane conditions that would follow the walkout. *Id.* If any of the John Doe correctional staff can be considered as being personally involved in the denial of Barrows's Eighth Amendment rights, it only can be those who locked him in his cell. He simply cannot name 250 unknown corrections officers as defendants and request that Defendants identify each of them. This goes well beyond "group pleading," where the plaintiff fails to explain which defendant engaged in what allegedly unconstitutional act and is insufficient to state a claim. *See Wright v. Orleans Cnty., N.Y.*, No. 14-CV-00622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) ("Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim."), *report and recommendation adopted*, 2015 WL 13660397 (W.D.N.Y. Oct. 17, 2015); *Spring v. Allegany Limestone Cent. Sch. Dist.*, 138 F. Supp. 3d 282, 293 (W.D.N.Y. 2015) ("Because the personal involvement of a defendant is a prerequisite to an award of damages under § 1983, a plaintiff cannot rely on group pleading against all defendants without making specific factual allegations."), *vacated in part on other grounds,* 655 F. App'x 25 (2d Cir. 2016) (summary order); *Adamou v. Cnty of Spotsylvania, N.Y.*, 12-cv-07789, 2016 WL 1064608, at * 11 (S.D.N.Y. Mar. 14, 2016)

("Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim.").

Barrows specifically alleges, however, that corrections officers or other security staff personally locked him and the other inmates in their cells with no regard for what would occur to them. This differentiates Barrows's complaint from group pleading. Thus, the Court finds, at this time and for screening purposes only, that those corrections officers or other security personnel who locked Barrows in his cell are plausibly alleged to have been personally involved in the denial of Barrows's Eighth Amendment rights.[8] Thus, the Court directs the AG's Office to confer with DOCCS and obtain a log, or other record-keeping method, to ascertain the full names and titles, and addresses where they can be served, of the individual corrections officers and other corrections staff who were staffed to work in Barrows's housing unit or block in and around February 17, 2025. *Cf. Andrews v. Officer from Sullivan Corr. Facility*, No. 21-cv-10518 (PMH), 2022 WL 1597695, at *2 (S.D.N.Y. May 19, 2022) (description of defendants insufficient when plaintiff did "not describe the[ ] defendants with enough detail to enable the Court to direct the New York State Attorney General's Office . . . to identify such individuals"); *Valentin*, 121 F.3d at 75 ("It is a general principle of tort law that a tort victim who cannot

---

[8] Barrows may amend his complaint, to the extent he can, to provide additional details regarding those individual corrections officers or other security staff at Elmira whom he claims were personally involved in denying him his Eighth Amendment rights or the other claims asserted in the complaint.

identify the tortfeasor cannot bring suit."). It is these individuals, if any, who would have been responsible for locking Barrows in his cell.

### F. State Law Claims

Barrows asserts two state law tort claims: "wrongful confinement" and negligence. Dkt. 1 ¶¶ 39-40. A district court has discretion to hear state law claims where the relationship between a plaintiff's federal and state claims present "but one constitutional case" and "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). If "plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding," the court will generally exercise supplemental jurisdiction if "judicial economy, [and] convenience and fairness to litigants" weigh in favor of hearing the state claims at the same time. *Id.* at 726; *see also* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

Barrows's two state law claims derive from the same operative facts as his federal claims and, thus, the Court will exercise supplemental jurisdiction over them for purposes of screening.

#### 1. Wrongful Confinement

"Some New York courts have described the tort of wrongful confinement as a 'species of false imprisonment.'" *McGowan v. United States*, 825 F.3d 118, 126 (2d

Cir. 2016) (quoting *Gittens v. State*, 132 Misc.2d 399, 504 N.Y.S.2d 969, 974 (N.Y. Ct. Cl. 1986)). "To recover for wrongful confinement, a prisoner must demonstrate that 'he had been subjected to punitive segregation for no legitimate reason and without the rudimentary protections of due process.'" *Id.* (quoting *Willey v. Kirkpatrick*, 801 F.3d 51, 71 (2d Cir. 2015)).

At this stage in the litigation and mindful of the Second Circuit's directive to construe *pro se* pleadings liberally, the Court finds that this claim may proceed to service against Defendants. Barrows alleges that he and all other inmates at Elmira were confined to their cell 24 hours each day at the beginning of the strike and from some time thereafter. Whether this is the type of punitive segregation satisfies the tort of wrongful confinement is not an issue that should be determined on screening. *See supra* at n.6.

**2. Negligence**

Under New York law, to succeed on a negligence claim, a plaintiff must establish: (1) that the defendants owed a duty of care to the plaintiff, (2) the defendant breached that duty of care, and (3) that breach proximately caused the plaintiff's injury. *King v. Crossland Savings Bank*, 111 F.3d 251, 259 (2d Cir. 1997). Based on the allegations set forth in the complaint, this claim may proceed to service against Defendants.

## CONCLUSION

Because Barrows has met the statutory requirements of 28 U.S.C. § 1915(a) and filed the authorization, his request to proceed *in forma pauperis* is GRANTED.

For the reasons above, Barrows's Eighth Amendment conditions of confinement and Section 1983 conspiracy claims and his state law claims may proceed to service against Defendants, NYSCOPBA, Hochul, Martuscello, and the John Doe Defendants, once identified, who were corrections officers or other security personnel assigned to Barrows's Block or Housing Unit on or around February 17, 2025. His First Amendment rights to freedom of association and incoming and outgoing mail, Eighth Amendment denial of medical care, and Sections 1985(3) and 1986 conspiracy claims are dismissed under 28 U.S.C. § 1915(e)(2)(B) and 1915A(b), but with leave to amend because they fail to state claims upon which relief can be granted.

Barrows may file an amended complaint by **November 9, 2026,** in which he includes the necessary allegations as directed above and in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

Barrows is advised that an amended complaint **completely replaces** the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977). Therefore, any amended complaint must include all allegations against each Defendant so that the amended complaint stands alone as the only complaint in this action.

Barrows is further advised that he has been granted leave to amend only those claims addressed above—*viz.*, First Amendment freedom of association and right to incoming and outgoing mail, Eighth Amendment denial of medical care, and Sections 1985(3) and 1986. A district court has the inherent authority to dismiss

claims that exceed the scope of the court's order granting leave to amend. *See Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012) (summary order) (collecting cases).

**ORDER**

IT HEREBY IS ORDERED that Barrows's motion to proceed IFP (Dkt. 2) is GRANTED; and it is further

ORDERED that the Eighth Amendment conditions of confinement and Section 1983 conspiracy claims and the state law claims against the New York State Correctional Officers and Police Benevolent Association, Inc., New York State Governor Kathy Hochul, New York State Department of Corrections and Community Supervision Commissioner Daniel Martuscello, and the John Doe Defendants, once identified, who were corrections officers or other security personnel assigned to Barrows's Block or Housing Unit on or around February 17, 2025, shall proceed to service; and it is further

ORDERED that the remaining claims alleged in the complaint are DISMISSED pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state claims upon which relief can be granted, but with leave to amend; and it is further

ORDERED that Barrows may file an amended complaint as directed above by no later than **November 9, 2026**; and it is further

ORDERED that the Clerk of the Court shall send to Barrows with this order a copy of the original complaint, a blank Section 1983 complaint form, and the instructions for preparing an amended complaint; and it is further

ORDERED that if Barrows does not file an amended complaint by **November 9, 2026**, the claims dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state a claim—*viz.*, First Amendment freedom of association and right to incoming and outgoing mail, Eighth Amendment denial of medical care, and Sections 1985(3) and 1986—will remain dismissed; and the Clerk of the Court shall cause the United States Marshals Service to serve copies of the summons, the complaint, and this order upon Defendants New York State Correctional Officers and Police Benevolent Association, Inc., New York State Governor Kathy Hochul, New York State Department of Corrections and Community Supervision Commissioner Daniel Martuscello, and the John Doe Defendants, once identified, who were corrections officers or other security personnel assigned to Barrows's Block or Housing Unit on or around February 17, 2025, without Barrows's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Barrows's favor;[9] and it is further

ORDERED that pursuant to *Valentin*, 121 F.3d at 77, the New York State Attorney General's Office is requested to ascertain the full name, with correct

---

[9] If Barrows files an amended complaint as directed in this Decision and Order, service will be deferred until such time as the Court has screened the amended complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a)-(b).

spelling, and last known service address of New York State Correctional Officers and Police Benevolent Association, Inc., New York State Governor Kathy Hochul, New York State Department of Corrections and Community Supervision Commissioner Daniel Martuscello, and the John Doe Defendants who were corrections officers or other security personnel assigned to Barrows's Block or Housing Unit on or around February 17, 2025. The Attorney General's Office need not undertake to defend or indemnify this individual at this time. Rather, this Decision and Order merely provides a means by which Barrows may name and properly serve these defendants, as instructed by the Second Circuit in *Valentin*.

The Attorney General's Office shall produce the information specified above by mail (Pro Se Litigation Unit, United States District Court, Robert H. Jackson United States Courthouse, 2 Niagara Street, Buffalo, New York 14202) within **30 days** of the date of this Decision and Order. Upon receipt of this information, the Clerk of the Court shall amend the caption of this action to reflect the full names of these defendants; and it is further

ORDERED that the Clerk of the Court shall forward a copy of this Decision and Order and the complaint by email to Christopher L. Boyd, Assistant Attorney General in Charge, Buffalo Regional Office, at Christopher.Boyd@ag.ny.gov; and it is further

ORDERED that, upon service, pursuant to 42 U.S.C. § 1997e(g)(2), defendants shall answer or respond to the remaining claim of the complaint; and it is further

ORDERED that pursuant to Western District of New York Local Rule of Civil Procedure 5.2(d), Barrows must immediately notify the Court in writing each time his address changes. Failure to do so may result in dismissal of the action with prejudice.

SO ORDERED.

Dated: September 25, 2026
Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE